Our case for argument today is 23-1101, EcoFactor v. Google. Ms. Anders, please proceed. Good morning, and may it please the Court, I'm Ginger Anders, representing Google. The District Court abused its discretion in this case by holding that the reliability of Kennedy's testimony assigning the ex-royalty rate to the three lump sum licenses was a matter for the jury to decide for itself. Rule 702 has long required the District Court to ensure reliability before admitting challenged expert testimony. Here, Kennedy's testimony was clearly unreliable. He testified that the licenses' non-binding recitals of EcoFactor's belief that its licenses had agreed to the royalty rate, combined with EcoFactor's CEO's unsupported and self-interested assertion that that had happened, established that every EcoFactor licensee had, in fact, agreed to the royalty rate. Let me ask you what I view to be somewhat of a threshold issue here, probably a little bit more broader issue than the one that you were describing. You say in your brief that Rule 702 requires District Courts to serve as rigorous gatekeepers. And throughout your brief, there's other parts where you say that here the expert testimony must be subject to rigorous reliability testing. And I found numerous other places in your brief where you use the word rigorously. And apparently, if we all carried placards around with us, you would say rigorously. So you believe that what happened here at the District Court level was less than rigorous, correct? I do. And you believe that the District Court should look at Daubert and Rule 702 and be more rigorous from here on out. That's why we're here and that's why this is a non-binding court. You want a more rigorous application of 702 and the Daubert Rule, correct? So I don't think that we're arguing that the standard should be increased from where it is today. I think what we're saying is that what we are saying is that this Court should reaffirm the longstanding Rule 702 principles that have been in place, I think, for decades now and that we're reaffirming. So you're not advocating a new rule or a new requirement? We're definitely not advocating a new rule. Just that Rule 702 and Daubert should be applied more rigorous. I think it should be applied according to its terms. I think the District Court didn't do that here. And if I could just make a couple points to give context to that. I think it should be applied in accordance with what the statute says and what the Supreme Court said in Daubert. But you don't feel that that's what happened here and you want us to look at it. So we can say that the application of 702 and Daubert is done on a case-by-case basis. It is absolutely done on a case-by-case basis. And in this case, you think that it was not done correctly. And that's because of the facts of this case, correct? It's legal error as well as the facts of this case. The legal error that the District Court committed was it said, it looked at the Daubert motion and it said, this is a matter for cross-examination. So in other words, the District Court didn't do the gatekeeping under Rule 702. That's a legal error. You're not promoting a new rule or a new requirement with respect to Daubert and Rule 702. You just don't like the rule in the outcome in this case. That's correct. We think that this was an abuse of discretion. And if I could explain a couple things about why that is, starting with the standard and then what the District Court did. So the standard here, I think, is Rule 702B says the expert's opinion has to be based on sufficient facts and data. And that was what was the problem here, that Kennedy's testimony was not based on sufficient facts and data. And I think the standard for that really comes from the Supreme Court's decision in Joiner. I think this is a good statement of it, where the Supreme Court says what you do is you look at the expert's opinion and you examine whether the analytical gap between that opinion and the facts on which the expert relied is too great, such that essentially the expert is relying on ifsy-dixit rather than reason and analysis. And then the other thing the District Court does, and you see this in this Court's cases as well as all the cases we've cited in our brief, the Court looks to whether the evidence on which the expert relied is of the sort that an expert would reasonably rely on. And that is what did not happen here, because the district judge didn't view the reliability analysis at all. He kicked it to the jury, which, as I said, was legal error. But I think the other problem here is that it is difficult to imagine a clearer example of expert ifsy-dixit than what happened in this case. Ms. Andrews, what about the language in 702 about demonstrating to the Court that it's more likely than not that these factors are satisfied? How does that impact what you're saying? So I think that has always been the Rule 702 standard. What the Fifth Circuit said in the Arthur case that we cited in our brief, which was before the 2023 amendment, was that the proponent of the expert testimony has the burden to show to the District Court by a preponderance of the evidence that the testimony is more likely than not reliable. So that has always been the standard. It was Ecofactor's burden here, and I think that's another reason the District  What the advisory committee called out was the improper in looking back at what many courts or some courts had been doing, but the improper application by holding the critical questions of sufficiency of an expert's basis and the application of the expert's methodology as questions of weight and non-admissibility. That's exactly right, and that is exactly the problem. That is what happened here, what the District Court did. And so I think the 2023 amendment makes that very clear, makes it unmistakable, but it was already the standard before, as you can see in the Arthur case, which was from 2022 in the Fifth Circuit. It seems a little hard to understand what the District Court did because he didn't say anything about it. I think that's correct as well. It is difficult to evaluate under abuse of discretion review when there is no reasoning to look to. Do you think a District Court should write an opinion any time there's a Dalbert challenge? I think it's going to depend on the circumstances. I think obviously there would be some cases where it's pretty straightforward and a District Court wouldn't have to say very much. There are other cases where maybe it does have to explain a little bit. I think there's no magic words. Requirementally, no. Shouldn't we send this back down and have the District Court review this in the first instance? As far as providing the explanations for the rulings that he did do, we just simply have him do the rulings over. So I don't think so for a couple of reasons. I think, for one thing, I think it is very clear here. I think there's really only one right answer here, and this Court has said that when there's only one right answer, you don't have to remand to have the District Court do it again. And I also think it's really important for this Court to give guidance as to the standard here because I think that if this kind of expert testimony is allowed, this really impacts a lot of important patent values here, right? This is not just about an expert taking, you know, his own client's interested assertions and sort of asserting them as expert, as the expert's authoritative conclusion, which is what happened here. But there are patent values at stake. The point of using for... Before you get into that, I just want to better understand. You say the evidence here is very clear and there's only one right answer. I suppose if I agreed with that, then it follows that we should just take care of it. But what if this is like what I assume is the more common case where the evidence is not very clear and there's not just one right answer? If I see it that way, why would I not remand to Judge Albright for him to comply with Daubert in the way that you say we should remind him he needs to do? Well, I think that course is certainly open to this Court if it thinks that that should happen in the first instance. But I do think that it would be helpful here to give guidance because of the extremity of this case, because this is a case in which you have licenses that have solely a nonoperative, unilateral clause stating e perfectus belief. That this royalty rate was used... Is your position that those recitals, those nonbinding recitals in the agreements are irrelevant to the question or that they're not sufficient to form the basis for an expert opinion? I think they are not sufficient as a matter of law, essentially. In two of the licenses... But not irrelevant? I think they become irrelevant because they simply can't establish what Kennedy wanted them to establish. So in two of the licenses, there were operative clauses that said the lump sum amount is not... Just to be clear, you're not saying the licenses are irrelevant and shouldn't have been entered into evidence, correct? No. Yes or no? No. We objected to the royalty rate in the licenses. But you didn't object, so you don't... We didn't object to the licenses in the licenses. Did you object to the royalty rate? I mean, isn't one of the standards in reasonable royalty analysis what the patentee would want to get for its royalty rate? And so don't the licenses at least offer some evidence of what the patentee was seeking? They are relevant. They would be relevant, I think, for that purpose. Okay. But that, very importantly, is not what Kennedy testified to. I mean, it's like the licenses were regarded as value, right? Right. So what Kennedy testified to was he said, he was asked, is there evidence of a royalty rate in this license? He said there's X rate in the whereas clause per unit for the estimated past and projected future sale of products. That's at 5773. So what he testified to was that these licenses reflected the licensees' binding agreement to apply the X royalty rate to their sales. But the licenses simply did not support that proposition. They had lump sums, but, of course, again, two of the licenses had operative clauses that said the lump sum is not based on sales and does not reflect a royalty. And even in the third license, it was simply a non-operative unilateral clause that cannot reflect the agreement of the two parties. And so just to get back to the question. What about Kennedy's testimony? Apart from the recitals and the licenses, he relied on the Habib testimony? Why is that not sufficient? So I think there are two problems with Habib's testimony. The first is that it simply doesn't support the conclusion, again, that the licensees agreed to apply this rate. And it's also not the sort of evidence on which an expert would reasonably rely because it is an unsupported assertion by an interested party as to the key fact. In the damages case. And I think that's true. Is there any evidence in the record that an expert who deals with damages and finances would not rely on their own client's statement as to what their financial records are? So I think it depends, actually, on the circumstances that are at issue. But I think what the cases that we cited in our brief say, what decision after decision says is that an expert may not – an expert is unreliable when he simply takes his client's unsupported assertions on faith about critical facts and then relies on them. So, for instance, the endless – Well, it turns out to be true that financial experts all the time rely on their own clients' representations about their finances. They may put a caveat in their opinion. My opinion is only as good as the inputs that were given to me. But maybe as an empirical matter, experts rely on their own clients all the time. And I think there are many situations in which they can. So, and again, I think the district court would have to evaluate this on the circumstances. So, for instance, if an expert is relying on ordinary court's business data that's created all the time, not just for litigation, it seems like something that the expert wouldn't have to verify. And I also think the sort of caveat that Your Honor is talking about is very important because what Kennedy testified to here was that the licensees agreed to use the rate as a matter of fact. That's what he testified to. He didn't testify, well, assuming that, you know, what people have told me is correct. I'm going to just take that assumption as true. And so the Champaign-Meadows case that we cited in our brief makes clear that there's a big difference when an expert testifies, as a matter of fact, I have concluded that this was the case. That is very powerful testimony. And that enabled that. You're not challenging reliability, right? You don't have any separate arguments on reliability. You're challenging really about the sufficiency of facts. So I think the two things are wrapped up with each other. And that's because an expert's... But you don't address directly reliability. But you do address quite a bit on and devote quite a bit of space to sufficiency of facts. So we do say that we think that Kennedy's opinion was not based on a reliable methodology. But it's not really a separate argument because it's not a reliable methodology because he bases conclusions on insufficient facts and data. I think the two things in this circumstance really are intertwined. But I think that sort of makes sense, right? So with respect to that part that deals with sufficiency of facts, we give broad discretion to the trial court, correct? It's an abuse of discretion standard, yes. But I think it's clear that the district court abused its discretion here. And, again, I think if you look at the licenses, this unilateral whereas clause, which states only eco factors view, and then you have Kennedy testifying... What's the problem with reliability? A hypothetical negotiation? Is that an unreliable method? No, it's not an unreliable method. But, of course, this is sort of an antecedent stage where what Kennedy said, the analytical gap here is that Kennedy used these unilateral whereas clauses that stated only eco factors belief and said, I see in that evidence that the licensees agreed to apply the rate. So there's this unbridgeable gap between evidence that eco factor thought this was the rate and what he wanted to establish, what he purported to establish, which was that the licensees themselves had agreed to apply the rate. I think that's very much like this court's decision in MLC where the expert said, I've looked at the most favored nations clause. It's got a 25 percent rate in there, and I am going to testify to that. Can you tell me what portion of Kennedy's testimony would point me to the specific portions that you think are the most unreliable because they're not supported by facts and record?  So at 5773, that's what I read before, where he's asked about the licenses specifically. He says there's X rate in the whereas clause. So he identifies this unilateral clause, this unilateral whereas clause, which is a nonbinding recital. He identifies that as evidence that the licensees themselves agreed to use the rate. And then later on at 5765, he's asked what is about the form of the, quote, the licensees themselves agreed to use the rate in the agreement. He says it is based on sales as a running royalty, but they, the parties, agreed to a lump sum for all those royalties. So he is saying that the lump sum was derived by applying the royalty rate to sales, that the licensees had done that. So, again, he is testifying that it is his conclusion that the licensees agreed to use the rate. And then later on, he says it is X per unit that other people have paid. That's on 5778. So, again, he's asserting that the licensees were paid. What does he say about Mr. Habib's testimony? If I'm misremembering that Mr. Habib said, I, of course, did not get to see the sales data, but my understanding is this is how this number was calculated, from which one might infer there was agreement to this number because it was calculated this way. What's insufficient about relying on the CEO's understanding? So several things. I think so what Habib is doing there is he's making a factual assertion about what that other parties agreed to this rate. But he doesn't have any foundation to make that kind of assertion. He was not involved. I think that's critical. He was not involved in the negotiations. He didn't see any sales data. Ecofactor as a whole didn't see any sales data. And this is what he admits to at 5692. And, of course, as I've been talking about, nothing in the licenses supports the conclusion that the licensees agreed to this. And I think what's also really important here is that Habib's testimony Just to be clear, did Mr. Kennedy have I think this word understanding came into testimony later. But pre-testimony, what did Mr. Kennedy have from Mr. Habib? I think it was essentially the same thing is my understanding of the record, that he had Habib's assertion that this had been used, but nothing more than that. That's my understanding of the motions. It's basically a no personal knowledge. Yes. Yes, exactly. And that's at 185, the motion eliminated that describes that testimony is that 185. Well, I think it's disputable whether Habib had personal knowledge. He was apparently subject to the confidentiality order because the settlements arose from litigation. So it's very common that he, as a competitive decision maker, wouldn't himself have access to the sales data of the licensees. But that doesn't mean that outside counsel who were advising him whether to sign the agreement, to sign the agreement and give up Echo Factor's patent litigation rights against those licensees, that he wouldn't have had a high-level understanding as to what he was giving up and what the value of that was. Why is that not even a reasonable interpretation of Habib's understanding and his personal knowledge? Well, again, I think there's a significant leap between what Habib actually testified to, which is this is just my understanding, period, full stop, I have no personal knowledge, and the idea that maybe the licensees actually did agree to this rate and somebody told Habib, et cetera. And I think it's really important that the burden here is on Echo Factor as the proponent of this testimony and the proponent of its damages case and the proponent of Kennedy's testimony to establish why this is reliable and what Kennedy relied on. And so, you know, the record comes to us in this way where we don't have any kind of understanding of... Who did Habib talk to about this? We don't know who Habib talked to. And so, again, this record is... I thought he described certain conversations in his testimony or referenced certain conversations in his testimony. Am I mistaken about that? As I stand here, I don't think that he referenced any conversations. He simply said that it was his understanding in his testimony at trial. And so I think there is a... Wasn't there an email in this regard or something like that? So there's an email between Johnson, one of the licensees. Is that what Your Honor is referring to? So I think that email is also... Didn't Habib negotiate the Johnson license? That's not my understanding. He testified that he was not involved in the negotiations. So there is a Johnson email, which is not with Habib, I think, is my understanding. And in that email, again, it doesn't establish that Johnson... Can I just interrupt you first to understand the email? My understanding of the record is the email was that Kennedy was not allowed to rely on... It is not something that Kennedy relied on in his testimony. And when you recall what it appears from the record, the reason was that Kennedy was not allowed to rely on the email? I'm not sure I want to hazard... Well, I thought the record indicated it was because of the person that negotiated the Johnson license was also a person on the trial team. I believe that's correct, yes. And so this was not part of what... He said so that the email was not permissibly used by Kennedy because of that. I think that's right. It came in nonetheless at trial, not in Kennedy's testimony. But not later. And it's not something that Kennedy relied on. And I do think Rule 702 instructs the district court to determine whether the expert's testimony is reliable based on what the expert has relied on. And so that's how the analysis would be done. I think you're right about that. But we're here technically, as I understand it, on your appeal for the denial of the motion for a new trial. So wouldn't that bring the whole trial record into question? And we should consider the whole trial record in deciding whether there was an abuse of discretion in denying your request for a new trial? I think as a practical matter, yes. That's why we're not... I'm not here standing to say that you shouldn't think about it at all. I do think that...  I just want to make clear. We can consider the Johnson email. I think you can consider it. I do think it is relevant, however, that it is not something that Kennedy relied on himself. Did the judge not rule that Kennedy could not rely on the email? It was admitted through Google's expert testimony later on. But my read of the record is that this is at 1109 of your supplemental appendix. That may well be. I think you could then think about this as a harmlessness question, I suppose. You could think about whether the email sort of provides support after the fact. I don't think it does. So I think however you get there, the email does not help. Does the email show anything more than that Ecofactor demanded an X rate? I think that's exactly right. It showed that Ecofactor proposed to that rate. And, of course, as this Court has said in Witserv, patentee proposals are one thing to be considered in the damages analysis, but they are not particularly probative because a patentee naturally has the incentive to inflate the royalty rate that they're seeking. And I think that's a critical thing to keep in mind about Kennedy's testimony here. He did not simply testify that this was a rate that Ecofactor wanted to get, that it had proposed to multiple licensees. He testified that the licensees agreed to pay this rate. And that is critical for the damages case because, of course, what you're trying to do in the damages analysis is figure out what the market value of the patent technology is. And what other licensees have paid is, of course, very relevant to that. And so it was incredibly powerful for Kennedy to come in and say, every single licensee has paid this same rate, which is why he repeats it again and again. If I ask you, Ms. Anders, about the Schneider license, this is the one that has not necessarily just a unilateral representation about the X dollar rate, but seems to me could be reasonably read as both sides, that is, including Schneider, the licensee, agreeing to the X dollar rate. I'm sure you're familiar with it. I'm looking at the copy at 10,400. But that whereas ends with nothing in this clause should be interpreted as an agreement by Schneider that the X dollar per unit is a reasonable royalty. Why could one not reasonably read that as Schneider saying, I understand that you're calculating our lump sum payment based on X dollars as a rate, as a royalty rate. We just are reserving the right to say we don't agree that it's a reasonable rate. We're paying it. And that's how things were calculated. We agree to that. But it's not reasonable. What is unreasonable about that reading? So I think that that reading doesn't work because, of course, this is a legal instrument. And so we have to come through all of its terms. And there is an operative provision in the Schneider license that says that the lump sum amount is not based on sales and does not reflect or constitute a royalty. And because that is an operative provision that reflects both parties' agreement, I think it's just as a matter of contract interpretation, it trumps anything that's in the unilateral clause. But as I understand it, what Echo Factor argues is that operative agreement that you've just pointed to is simply representing that the calculation was not based upon solely prior sales, but it really was based on prior sales plus projected sales. And that's all that the consideration clause you're relying on is saying. What would be unreasonable about that reading? Well, I think just looking at the text of the agreement, I mean, it says such amount is not based upon sales. It doesn't say prior sales, future sales. And, again, this is a legal instrument. We interpret the contract according to its terms. What if all that together means that there's a conflict between page one and page two of the agreement? There's an ambiguity. Shouldn't the district court resolve that ambiguity? Well, I think a whereas clause can't create ambiguity when you have plain provisions. Have you seen any cases that say that? There's a case that we cite in our brief talking about how whereas clauses can't trump an agreed upon as something agreed upon by both parties. But it could create an ambiguity. I agree they can't trump, but couldn't they create an ambiguity? I think only if the plain text of the operative provision were already ambiguous. Then maybe you would look to the whereas clause to discern something about parties' intent. But this is basically like the for all evidence rule. I think you look at the text of the agreement, nobody has ever questioned it. Ms. Sanders, if I can take you in a different direction. I take your point that in your view the analytical gap is too big between the whereas clause and Mr. Kennedy's assertion of a particular rate. What if the facts were different? What if these licenses said instead of the whereas recital, it said both contracting parties agree that this lump sum amount equates to X dollars per unit royalty rate. And then Mr. Kennedy would have said, yeah, my opinion is that that is in fact the rate of this license. The parties said so in the contract. Would you agree that that's fine? I think that, yes. I think that would be very different if you had something in the agreement that suggested that both parties had negotiation documents. And I ask because I felt like in the briefing there was a lot of discussion about how the expert's opinion, in order to have sufficient data and facts, it needed to all be verifiable, verified and verifiable. And my hypothetical, you wouldn't necessarily have a situation where it's verified or verifiable. So what I'm trying to understand is where is the line? Can you even describe the line of when is something sufficient data and facts or insufficient data and facts? So just to be clear here, I do think that, as Your Honor suggests, there would simply have to be some sort of factual evidence that the licensees agreed. So that could be in the whereas clauses, reflecting that both agreed. It could be an operative term of the agreement. It could be a negotiation document. The whereas clauses would be sufficient? I mean, given the cases that suggest that whereas clauses aren't very significant, if it's a nonbinding recital that's sought by the patentee and simply agreed to as an insignificant recital by the other side, that that would be sufficient? Well, so if I could just answer very quickly, I think that if you had a situation in – I think it would be a little bit context specific. But if you had a whereas clause that says both parties agree about this, then I think that would be some evidence at least from the licensee's side. And the parties would be able to look to that. And then the expert would be able to testify about it. The key thing is that we don't have anything close to that here. We have Ecofactor saying what it thought the royalty rate was. And then Kennedy taking that and testifying that it said something that it didn't, which is that the licensees had agreed to that rate. If I could reserve the time. Yes, of course. Thank you, Ms. Sanders. Mr. Liddell, please proceed. Thank you, Your Honor. If I may have just a second. Good morning, and may it please the Court. Brian Liddell from Russ Augustin Cabot on behalf of Ecofactor. I think broadly speaking, Google's argument rests on what we consider to be three critical mischaracterizations of the issues in this case. And I'd like to address all three, but I'd like to give you at least an overview of those. The first one is really that Google argues that Mr. Kennedy shouldn't have been able to reference the rates in these three licenses from Ecofactor under Rule 702 because Google disputes that those licenses were, in fact, based on the rate that was stated. Counsel, I didn't hear Google, at least today or in its brief, say Mr. Kennedy couldn't refer to the rate. I thought, in fact, that Ms. Anders conceded that Mr. Kennedy could have relied on the rate for purposes of establishing what the patentee sought in terms of a rate. I thought that her argument was focused on whether that was in a great amount that was agreed to by the licensee. Is that fair? I think that's close to what we heard today. I don't think that's what they said in their briefs. I think that's a change in position, frankly, from what's in the briefs. But I think what that leads to is the natural second question, the second issue, which is what's the opinion that Mr. Kennedy's offering? It's suggested that his opinion is just, well, I saw a rate in this license. That's the end of the analysis. I'm done. That is absolutely not true and not at all what Mr. Kennedy did. Mr. Kennedy looked at the profit attributable to the accused products, Google's gross profit per unit. He didn't get the X rate from that calculation, right? That's correct. But what he did was he apportioned that profit. He determined what portion of that profit was attributable to the patented features. He looked at a variety of things to determine how, in a hypothetical negotiation, would the parties split that profit. How does that have anything at all to do with whether a particular licensee, like Johnson or Dakin or Schneider, agreed to pay X rate? What does Google's apportionment or Google's sales have to do with what those licensees agreed to? It goes to exactly, actually, the question you asked a few moments ago, which is isn't it relevant what the patentee would expect regardless of whether it was agreed to? Isn't that a relevant fact in the hypothetical negotiation? The answer is unquestionably yes. Once it's a relevant fact. I just don't understand that to be what's in dispute here. I understand what is in dispute to be whether it was appropriate for Mr. Kennedy to attribute to the licensees that percentage rate. So I think my point is that Mr. Kennedy looked at that number not as the end point of the analysis, but as how do the parties split the profit. The apportioned profit was more than three times this rate. And his analysis was that based on that, at the hypothetical negotiation, the parties would have arrived at this rate as a means to split that. I don't understand. I really think that you need to address the direct issue that we spent all of our time here on, and you're not. And the issue is was there a problem with Mr. Kennedy attributing that particular rate to those three licensees? Sure. Let's assume for the moment that that's a Rule 702 issue. And I don't really think it is. I think it's a fact question that is for the jury about whether those facts are believed, i.e., did the licensees pay that amount or not, and was the license based on that rate. But if we look at the evidence, even if we take that question as the Rule 702 question, the evidence was far more about what Mr. Kennedy was looking at and what the evidence showed than was suggested here. There were some questions about the e-mails, and specifically the e-mail with Johnson. So that's at pages 797 to, or excuse me, 10797 to 799 of the appendix. And it's an e-mail exchange back and forth where EcoFactors tells Johnson, these are the rates, and it uses the same stated rate. Johnson replies to that e-mail, we are applying the rates to the time period that EcoFactor has said is implicated in the investigation. That's a direct quote from page 798, 10798 of the appendix. We are applying the rates. Johnson said it. Not EcoFactor. Johnson. I hate to interrupt your time off, but Kennedy didn't rely on the e-mails, and I thought the judge excluded, precluded him from relying on the e-mails. So why is that? If I'm right about that, why is that a relevant point to make to rehabilitate the question of whether or not Kennedy's assertion of the particular rate is applicable here? Sure. So two points to that. First, to correct something that was discussed with my friend, I think Mr. Kennedy didn't specifically reference those e-mails in his report, which is why the court didn't allow him to testify that he relied upon them, because that wasn't part of his report. It wasn't specific to some question of privilege or anything like that. They were ultimately admitted. And because we're here reviewing a motion to grant a new trial, the record is that the judge did not preclude Kennedy from relying or testifying about those e-mails. I believe the judge did preclude Mr. Kennedy from specifically testifying about those e-mails. So they weren't part of his consideration. They're not part of his testimony or his report, the reliance on the e-mails. But his testimony was one of the facts that I considered is that these are licenses that were based on a particular rate. The jury then gets to evaluate, do I believe that that fact is true or not? The sufficiency of the evidence test is, is that a fact that, if true, if the jury believes it, is sufficient to support his opinion? So if the jury concludes that these licenses were, in fact, based on the stated rate, would that fact support Mr. Kennedy's use of that information in his opinion? I don't think there's really a dispute that that would be sufficient facts to support him or be an underpinning of his opinion. So then the question is, well, is there enough evidence for the jury to conclude that that fact is true? That's a substantial evidence question, and it's one that we think is more than completely answered by the evidence. So the e-mail alone, we think, is confirmatory. And what happened after that e-mail? Well, they negotiated and ultimately entered into a contract where the recital that we've seen in various of these agreements was included in the agreement with Johnson. There is not one word of contradiction in the Johnson agreement that that's not the rate that's applied. But what the Johnson agreement says is that Echo Factor believes that X was the rate that was used to calculate it. That's correct. And Johnson said that's sufficient. I mean, there's a risk here, isn't there, that in framing these license agreements, the faculties will put in recitals like that that they intend to use later on, even though it doesn't really reflect the reality of the agreement? Well, I think, first of all, I don't really think so. I mean, Mr. Kennedy testified, for example, that it's incredibly rare to find a provision like this in a license. He explained that he's not familiar with seeing this almost ever in litigation settlements. So it's not as though this is a provision that's very common. He acknowledged and noted that it's unusual to see this kind of a recitation. He also explained that he didn't just rely on the recitation. He relied on Mr. Habib, who didn't simply say, well, I think that's what we were doing. What was the purpose of the recitation? Why did Echo Factor want to have this recital in there at all, given that it has no effect? Well, I wouldn't necessarily agree that it has no effect. Well, it has an effect here. I know that. But I'm talking about it for purposes of that contract. Well, I think, you know, if you're an entity that's entering into these agreements and wanting to, you know, maintain your position, you're not only talking to one licensee. And for the same reasons we're talking about here, it's important that other licensees recognize the same rates. And when Echo Factor is negotiating with subsequent, they want to be able to say, look, we negotiated based on this rate. You know, that's exactly the point I was asking about, that there's a risk that they're putting it in there to use in future negotiations. No. Rather than as a reflection of what actually happened. I think whether that risk exists or not, I don't think there's evidence that that is what's happening here. Because, as I said, we have evidence from in the Johnson instance where they acknowledged in pre-licensed negotiation correspondence that they were applying the rate. Do we know how Echo Factor calculated this very specific number for the rate? You mean how they decided that that was what they felt it should be? How did they calculate it? Where did they come up with the number where they said, you know, this lump sum payment converts into this very, very specific rate? Sure. So I think one place, and Mr. Habib talks about that in his testimony at pages 56, 7. They didn't get the sales data, right? That's where I try to break it down like that. Go ahead. How did they do it? So what he said is, he was asked exactly, where does this come from? This is at page 56, 70. And he said it comes from his understanding of the market space. But this is based on his understanding of these competitors and what their sales volumes generally are. He may not have the precise numbers, but he knows who his competitors are and more or less where they sit in the marketplace. Did he say that? Yes. Where did he say it's based on my knowledge of the competitors and their sales volume? Because that's what you just said. And I didn't see that in his testimony. So he speaks to that at the page that I mentioned. Page and line number. Certainly. So he specifically talks about this when he talks about each of the licenses, which begins at 57, 64. Excuse me. Sorry. Not 57, 64. 56, 67. 67. And what line number? So as we go along, I apologize. I'm trying to get you to the precise line because there's a lot of discussion of these issues. I just want to see where he said it was based on their sales volume. It says it at line 21, but then later on he says I didn't know what the numbers were. Well, but, right. So, right. And that's, thank you, Judge, that's exactly the right line though. But he says my understanding is that by taking their past and future projected sales and multiplying that, now he talks about his knowledge of each of these entities in the market, and it's also the case that he talks about his own company's knowledge. But he expressly says later that he had no idea what their projected sales were. Well. Or their actual sales. And no information was provided to him or anyone at Echo Factor. He had not derived any information. He didn't, you know, back-of-the-envelope calculate it himself or anything else. Well, but I think the suggestion, so I guess I want to push back a little bit on the notion that that's how we test a license agreement. Because I would argue that this Court's prior precedence when we have license agreements. The good news is this is in bank. True. But I think the Court has really consistently in cases like Word Tech or Witserv and others sort of pushed back on the notion that an expert can essentially reverse engineer a rate in a lump sum license. That it should be based on evidence that's more contemporaneous, that's tied to the license itself in some way, not something that is cooked up later and derived in some fashion. During the trial, did Google object to the admissibility or to the omission, rather, of this evidence? No. This was admitted without objection. And the jury is entitled to consider it and give it weight. I think the problem we have under 702 here is that this isn't a question about whether there were sufficient facts or data to support Mr. Kennedy's opinion. The facts or data, one of them, and it's certainly not the only one, was is there a like, you know, were there licenses that were based on a particular rate. He's saying I take as a fact that there were. That's a, to be sure, that's not an undisputed fact. But experts aren't required to rely solely on undisputed facts. And the question for is that fact true or not. The problem for me, Mr. Kennedy walked through three different licenses and said each of these represent the licensee and the licensors agreed upon royalty rate. What do I do if I see absolutely no evidence that supports that for, say, one of the licenses or two of the licenses? What do I do then if Mr. Kennedy's testimony hinged on the concept of an industry-wide rate, everybody's paying this percentage, but when, in fact, multiple of those licenses, I can find no record evidence to support it? What do I do? So I guess I would disagree with a couple of the premises. Well, I don't want you to disagree with the premises. I want to try and figure out what we do from a legal standpoint. Sure. Does it then become a sufficiency of the evidence question that the Court would look to rather than a question for the jury? Well, I think, so first, I don't think there's any dispute. And, in fact, I think Google's expert conceded this at trial. One is enough. One license would be enough to support an opinion in this regard. I don't think that was contested at trial, that one, you know, it doesn't need to be three licenses. So any one would be sufficient. And I think that that's – I don't think that's a controversial principle. I think it probably is a controversial principle because, I'll be honest, it doesn't make sense to me in light of what Mr. Kennedy testified to, which was effectively, without using these exact words, this is an industry-wide rate. And I don't see any testimony by Mr. Kennedy that specifies that the Johnson license in particular is indicative of what the whole industry would pay. And even worse for you, the Johnson license is the only one that never calls out the patented issue here in this litigation particularly. And Mr. Kennedy actually testified that we know the value derives from expressly listed patents. And he goes further and says the rest of the portfolio is thrown in for nothing. So this patent actually falls for the Johnson rate, Johnson license, in the category of thrown in for nothing. So that is not real helpful to you. I disagree with that on a number of – Which part? Did I misstate his testimony? I think so. Let's go one move. Let's finish the line. Let's do it. I'm here for you. Let's finish the line. But let me start by saying at a high level that I don't think – I certainly don't read Mr. Kennedy's testimony as saying it's only valid information because it's an industry-wide practice in some fashion. I don't think he said anything to that effect. Second, I don't think on the issue of is the Johnson license relevant – So let's look at page 5767 of the appendix. Starting at line 19, Mr. Kennedy explains, in a hypothetical negotiation, you would consider that. Google would say we've got two patents here. These license agreements are for the portfolio. That's true. But in the real world, what the focus is on is the asserted patents. And then when the gray moon is done, the rest of the patents are usually thrown in either for nothing or for very little additional value. And with regard to the Johnson license, do I remember the facts correctly, that the patent at issue in this litigation is not called in. It's in the category of thrown in for little to nothing. So the Johnson license – first of all, I think the issue you're raising about does the Johnson license relate to this patent and is it adequately adjusted for that, that's more of an apportionment question that the Court has indicated is not the subject of this proceeding. No. You said any one of these licenses. You brought this up by saying any one of these licenses could establish an industry-wide rate with regard to this patent. And I'm saying the one license, the only license you've talked about, your own expert said was thrown – basically thrown in for nothing. And you disagree with that because what he pointed to was the technical expert's opinion explaining that although this – and he also discussed this – that although this particular patent was not one of the asserted ones, a related patent that covered the exact same benefit and that conveyed the exact same benefit technologically to the licensee was included and that's what made it technologically and relevantly comparable. And that wasn't meaningfully disputed at trial. If I think it's important that we have to also look at what Mr. Kennedy said about Schneider and Dakin in order to assess the reliability of his testimony, what is your best evidence on those two licenses and why they established that the licensee was willing to pay X rate?  So in the case of Dakin – let's start there. In Dakin, there was once again pre-licensed negotiation correspondence. Now, it didn't – it wasn't presented to the jury, but it was something Mr. Kennedy relied upon and it was addressed in the Daubert motion and presented in his report and to the court. But there was also pre-licensed negotiation correspondence specific to this rate in connection with the Dakin agreement. Did he testify about that before the jury? He did not testify about it before the jury. But it is – if the question is did he have information on which he could rely, it's information he relied upon. He didn't necessarily have to cite every piece. I mean, we're kind of cutting back before the jury. You don't have to judge him by what he said, not by what he might have said. Well, I think it's information he relied upon. He also had Mr. Habeeb's testimony about the market and information specific. But where is it in the record? And the reason I ask is because Judge Prost asked you about a colloquy back and forth between your client and Judge Albright. And your client represented to Judge Albright that Mr. Kennedy was relying exclusively on the licenses, that he was not relying on anything else. And so that – I'm a little confused about how now he's relying on a document that's not in the record and that I have no access to, and isn't presently presented to the jury, and he offered no testimony on, and he didn't discuss anywhere. It is in the record. It's at page 1618 of the appendix, to be clear. The email I'm referring to is at page 1618 of the appendix. It was an exhibit in opposition to the Daubert motion presented to the district court. So I kind of dispute the characterization of what was done there, and I don't think that's really what was said at the hearing either. But in that instance, as I said, the Diken license, there was this pre-license negotiation correspondence as well. Once again, the recitation. Once again, Mr. Habib's testimony about his understanding, based on the market in which he operates, that that's a reasonable conclusion The counsel, again, this email at 1618 is simply an email from Echofactor saying what it wants for a royalty. It doesn't indicate what the licensee is paying. Well, you're right, Your Honor. It says what the licensee wants. It follows an email from Diken offering a certain amount, and Echofactor says, well, the license needs to be based on this relationship. Is it Diken or Johnson? Diken we're talking about now. And Diken is given that response. No, it has to be based on this rate, and ultimately the negotiated license is about 50 percent higher number in the lump sum than what Diken had originally proposed before receiving that email about the rate. So Diken proposed a number of approximately $1 million. The end license was about 1.5, as I recall, 1.6. So this is part of the negotiation that a reasonable fact finder could consider, certainly, and certainly that Mr. Kennedy could consider in determining is this really how these licensees paid this rate, if that's even a Rule 702 question. With respect to Schneider, I think there's been some colloquy already about the language of the clause itself, that Schneider negotiated language that reasonably can be understood as indicating that they were paying this rate. If that's all true, why isn't it possible for you to make the case and to provide your expert with a basis for his opinion to call the Schneider and Diken and Johnson witnesses and have them testify as to what their understanding was so that there's a sound basis for the expert opinion? Why is that not possible? I don't necessarily want to suggest it's impossible. I just don't think it's necessary. I think the question becomes, is there substantial evidence from which a fact finder could reach the factual conclusion that these licenses were based on this rate? There definitely is. Once that's true, this is a question for the jury, not for a judge to decide. But as the proponent of the expert testimony, you agree that the burden is on you to show that it meets all of the requirements of 702, and by not subpoenaing the licensees, I guess you are taking the risk that you are not going to meet that burden. I agree that it's the burden of the proponent to satisfy the requirements of 702, but let's be clear about what the requirements of 702 are. 702 requires that an expert's opinion be based on sufficient facts or data. The fact or data is there are licenses, they're at this rate. It's not sufficient evidence to prove that that fact is true. That's not what 702 demands because that's a question of how do you assess the factual truth of the fact that the expert is using in his opinion. Obviously, I don't think there's any dispute that experts need not rely on undisputed evidence only or that if an evidence is controverted, the expert can't rely on it. Experts can rely on disputed facts. That's painfully clear in the advisory committee notes to writing Rule 702, that that's not what the rule is about. It's not about resolving the factual dispute of is the fact that the expert is considering true. It's about is the fact, if it's true, sufficient to support the opinion. There's some confusion here, though, because everything you just said really could be going to weight in light of miscibility. And we have to try to understand whether the expert's basis for his opinion was based on sufficient facts. I mean, that's step one before we get to the weight of the ultimate question of what was, you know, what could the jury decide was the actual rate. We have to figure out whether the expert's allowed in the front end to even opine on these contested questions. And so, therefore, 702 has some work to do. And so you have to acknowledge that and try to explain to us where the line is between admissibility and weight. So I agree with you that 702 does have some work to do. But I think the work to do for 702 in this specific context is if that fact is proven to be true, is it sufficient? Is that a sufficient fact? But what if there are times where what you are relying on is just too, too slender of a read. Sure. To be something that anybody could regard as a sufficient fact. If they were just to isolate down on the Johnson license and we just had this one bare recital with nothing else to go on, I guess the question is why is that alone enough to be deemed a sufficient fact under these circumstances? Sure. Well, I think it's – let's be clear. I don't think the Johnson license, like, again, is it a sufficient fact that the license was based on this rate? That's the sufficient fact question. There is a separate question. Isn't the question whether the licenses bare recital of a rate, whether that is a sufficient fact to support the conclusion that that rate represents both the licensee and the licensor's view of what the rate was? So I think that this gets to a question not so much of a question. Yes or no? It's just a question. Do you think that is the question or do you have a different framing of the question? I have a different framing of the question. Okay. So I think that what you're addressing is how much evidence is there to support that fact? Well, is there sufficient evidence? And is there enough evidence? And that is actually the question that I would argue is part of 702A, the relevance question. The courts have – courts consistently look to that relevance question as is there a tie. So let's say the expert says I'm assuming fact X, but there's nothing anywhere in the record that has any bearing on fact X or that might tend to show that fact X is true. That would make the opinion, while perhaps based on sufficient facts, irrelevant under 702A because it's not actually connected to the evidence. That's a circumstance where – that's the circumstance in which there's an opportunity to evaluate is there some evidence that a reasonable fact finder could look at and say, okay, I believe that this fact is true. But that's the level of inquiry. It's not do I, the district judge, decide that I believe the fact to be true. The drafters of Rule 702 made very clear that's not the test. That the test is do I believe at most that it's sufficiently tied to evidence that's going to be coming in in the record such that a reasonable fact finder could decide, yes, that fact is true. And that's a question that we review obviously through the lens of after a trial, facts supporting the verdict, and is there sufficient evidence. I would like to just briefly touch on – I know we've talked about – I just want to ask before you do that, one of the problems I have here is we don't really have much, if any, explanation from Judge Albright as to how he evaluated all of this. And your friends Google cite the Carlson case from the Fifth Circuit that says, at a minimum, a district court must create a record of its Daubert inquiry and articulate its basis for admitting expert testimony. You don't respond to that. Did Judge Albright comply with what the Fifth Circuit requires for a Daubert inquiry? And if he didn't, why shouldn't we send it back and tell him to do it again? He did comply – let me rephrase both of those pieces. He did comply. First, in Carlson, the facts were that the expert basically was offered a trial. The district judge admitted the expert without having any proceeding of any kind as to whether there was a reliability problem, whether it met 702 or not. And the court ultimately determined that that expert should never have been allowed to testify, wasn't a qualified expert, and therefore should have not been permitted to testify, and that the court should have – But what did Judge Albright do, and why shouldn't we ask him to do it again? So what Judge Albright did was he received extensive briefing on a fully briefed Daubert motion with hundreds and hundreds of pages of exhibits and evidence supporting why the opinion was admissible. He heard oral argument and asked questions about whether, in fact, there would be evidence coming into the record through a witness. Did he articulate his basis for admitting the expert testimony of Kennedy? I don't believe he articulated in so many words that's the basis. I think we heard counsel – What did he say in so many words? Did he say anything more than deny? He stated that he didn't believe that it was inadmissible, which is the conclusion. He didn't state a reason for that conclusion in that type of form. So why shouldn't we have him do it again? Well, for two reasons, and it does actually dovetail with my last point, which is the First, if his opinion – if the testimony was admissible, whether he said it correctly or not, there's no basis to remand just to do the trial over again. And, indeed, the cases make pretty clear that are cited by Google and others in the amici that that's not – that's not appropriate. There's a number of cases that basically say it's pointless for an appellate court to send a matter back to have a retrial with the same evidence. That makes no sense. The second point is really the last one I wanted to hit on, which is the harmless error problem, which is never addressed by Google. Can I just ask one? Did Mr. Kennedy at trial testify that, in his view, these licenses do reflect the X rate as agreed upon, or did he say, on the assumption that they do, I think that's a good basis for a royalty? So I think his testimony was essentially the licenses – he said essentially the true facts. The license says this, and I spoke to Mr. Habib about them, and so that's – these are licenses at that rate. He didn't say, I analyzed it and made that conclusion. It's not an opinion. It's just – So the structure of his testimony was not quite what I took your alternative framework to be, namely, on the assumption that this fact is established elsewhere. Here's a conclusion about not the agreed upon – you want to put the – these licenses reflect an agreed upon rate at X. You want to put that as the premise and Kennedy as merely drawing an inference about what, therefore, a reasonable royalty rate. I take it the other framing is he actually testified to drawing the inference to what the agreements agreed upon. He testified that that was the nature of the agreements as sort of a factual matter, which would have been testified to already by Mr. Habib. And that testimony might be quite wavy to the jury, right? I wouldn't necessarily agree with that, because the same rate, for example, comes in – I think we heard that the licenses come in, the jury sees that, the jury sees that that's Ecofactor's expectation, that it's Ecofactor's belief. All of which lead to this harmless error problem. But separate from that, there were multiple independent bases, and we laid them out in our brief, why the verdict stands on other evidence unrelated. Okay. Counsel, I thank you for your argument. Ms. Andrews, how much time does she have left? I give her five minutes, because I don't balance out the time. Thank you. Thank you. I'd just like to make a couple of quick points. So first, in response to your question, Judge Sterling, your question – Don't get away too far. I would like to address something that – the questions that were coming up when your friend was arguing. You said that in the abstract, it's possible that one could be enough. It is not enough here, and let me explain why. It's because – But he did say that it is possible, that one license. It is possible, but the testimony would have had to be very different here if Kennedy had testified only to one. You did not argue in your brief that the Johnson license here was not enough. Alone. Yes, we argued that you were right. We argued that you would still have to order a new trial even if you thought the Johnson license was enough. That doesn't answer my question. We said that it was not enough alone. It's not enough because it only has the unilateral whereas clause, which doesn't go far enough. You would still have to order a new trial because the testimony would have had to be totally different. What Kennedy testified to – If the Johnson license is enough, then the relevancy of the other two licenses doesn't matter. I think – well, I do think that they should fall out. The Johnson license is not enough because it just has the unilateral clause. There's still the same analytical gap, and the damages theory would have had to be very different. What Kennedy testified to over and over was all three licenses paid this rate. It is essentially an established rate, and therefore, Google should pay the same. That's at 5778 to 7979. Google should pay the same rate as comparable licenses. He would have had to say something very different if it were only the Johnson license because that license didn't include the asserted patents, and he would have had to make a lot of adjustments in the apportionment analysis. Now, if I could just make two quick points, the first is that, as I was just saying, I think there's no question about what Kennedy actually testified to here. He testified over and over again that these licensees agreed to use the X royalty rate, and that's why it was so powerful in the damages analysis. That was the entire theory of damages. It was the keystone of their theory. Having chosen to have Kennedy testify that the licensees agreed to pay that rate, the jury, equal factor, subjected that assertion to the strictures of Rule 702. So that is what had to be supported by sufficient background. But that is all in the context of an opinion. The jury was not misled that he was a fact witness and he's saying as a factual matter the licensees agreed to it. It's all in the context of, hey, as an expert reviewing the record as a whole, it is my opinion that the parties agreed to that. Of course, but that is incredibly powerful, right, because we don't expect lay jurors to parse the difference between a whereas clause and an operative provision when you have an expert coming in and saying, I'm an expert in IP transactions, I've been qualified, and I think that these licenses reflect the fact that the licensees paid the X rate. That is incredibly powerful. That's exactly why equal factor had him testify to that, because that made the damages analysis as a whole incredibly intuitive. All the licensees paid this. Google should pay it, too. That's what's fair. That was the testimony. And the final point I'd like to make is that I think there is really an important role for this Court on Lock as an appellate court in thinking about Rule 702 and enforcing the outer bounds of Rule 702. As this Court said in Clause I, the way we think about expert testimony and reliability is informed by the legal principles that govern the patent damages analysis. And then the other thing the Court has recognized is that those legal principles and what's permissible and what's not at trial affect primary conduct by patentees and by defendants. And so I think it's incredibly important here to keep in mind the principles at stake. And I think there are a couple that dovetail here. The first is that the Court has repeatedly said that lump sum licenses are not probative of a royalty rate unless there's some basis, some reliable basis to transfer, to translate the lump sum to the royalty rate. And then the other thing the Court has said that I think is really important here is that while patentee proposals, patentee offers can be relevant, they aren't the be-all and end-all. They can't themselves establish what the rate should be in the damages analysis because the patentee has a natural incentive to inflate the rate. And so when you put those things together, I think a patentee has to come in. If it's going to say that these lump sum licenses are what should be used as comparable licenses, it has to proffer a reliable basis to transfer. Counsel, it wouldn't even just be the patentee that would have that incentive in this case. Wouldn't each of the licensees have an incentive to have an inflated royalty rate that doesn't correspond to what they actually paid because then their competitors would have to pay that higher premium? Well, I guess I can't really speak to what incentives the licensees would have. They might have an incentive to not admit that there's any particular royalty rate. I think what's clear is that they don't have an incentive to negotiate the unilateral clause. Was there an objection made? I asked this question to the other side. There was an objection made at trial as to the admission. Yes, we preserved it. Yes, we preserved it. It was pre-trial and a motion eliminated. No, no, no. I mean, during the trial when the actual evidence was admitted and submitted for consideration in the jury, was there an objection at that time? We didn't need to make an objection. There was not. There was not. We didn't need to because under Rule 103B. Okay. You said no? There was not an objection at trial in the moment because under Rule 103B, we didn't have to make one because we had preserved it in the motion and eliminated it. If I could just make one final point, just going back to the point about how the rules were going to be. It's important to me because if parties are allowed to seek a new trial on the basis of evidence that they did not object to its admission, it seems to me that that kind of sets up the whole process where a party can wait until they get the verdict, make a determination as to whether they like the verdict or not, and then file a motion. And the way to prevent that is by requiring that there be an objection at the point of admissibility during the trial itself. The admissibility, the admission to evidence. Well, I think under Rule 103B, there wasn't required to be an objection at trial. So Google complied with 103B by objecting pretrial. And I would say that even if you thought that the rate in the licenses was appropriate, I think the testimony was not reliable for all the reasons we've been talking about. But it's just the last point I'd like to make, just going back to this idea of how the rules affect the conduct. You know, my friend on the other side said that this kind of unilateral clause, just asserting a rate in a license, is rare. It will not be rare in the future if this kind of, if this expert testimony is upheld. Patentees could enter into small lumpsum licenses. They could insert unilateral assertions about what the rate they think should be. Licensees would have little incentive to protest in many cases. And they could use expert testimony to transform those unilateral assertions into authoritative expert testimony that the licensees actually agreed to this rate. That, I think, will undermine the jury's ability to reach fair and apportioned verdicts. And it will ultimately harm innovation. So I think for that reason, the court should police the outer bounds of Rule 702 here and order a new trial. Okay. I thank both counsel. This case is taken under submission.